**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SCOTT D.H. REDMAN, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RADIOSHACK CORP., a Delaware corporation, | ) ) | No. 11 C 6741 |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| MARIO ALIANO and VICTORIA RADAVICIUTE, individually and on behalf of all others similarly situated, | ) ) ) ) | Magistrate Judge Maria Valdez |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RADIOSHACK CORP., a Delaware corporation, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on Plaintiffs' Motion for Final Approval of Settlement Agreement and class counsel's request for attorneys' fees, costs, and expenses, and for approval of incentive awards for class representatives [Doc. Nos. 124 and 129]. For the reasons that follow, the motion for final approval is granted with an adjustment to the requested attorneys' fees, and the objections to the parties' proposed settlement agreement are overruled.

## BACKGROUND

### I.   PROCEDURAL HISTORY

Plaintiff Scott Redman filed a class action complaint against defendant RadioShack on September 26, 2011. Plaintiff alleges that he made a purchase at RadioShack with a MasterCard credit card and that the information printed on his receipt included the expiration date of that card, in violation of the Fair and Accurate Credit Transactions Act ("FACTA"), which prohibits businesses from printing "more than the last 5 digits of the [purchase] card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction." 15 U.S.C. § 1681c(g). Plaintiff brought suit on behalf of all RadioShack customers after 2008 whose receipt displayed the expiration date of the credit or debit card used in a purchase. (Compl.¶ 15.) On January 11, 2012, the District Court then presiding consolidated Redman's claims against RadioShack with those of Mario Aliano and Victoria Radaviciute based on relatedness. [Doc. No. 26.]

Beginning in March 2012, the parties engaged in several rounds of arms-length settlement negotiations before this Court. During this time, litigation proceeded before the District Court, including significant discovery motion practice. Thereafter, the parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 29 U.S.C. § 636(c), and the case was reassigned to this Court on May 17, 2013.

2

On May 16, 2013, Plaintiffs filed a motion for preliminary approval of the class action settlement agreement, requesting that the Court issue preliminary approval, approve the parties proposed notice plan, appoint Plaintiffs' counsel as settlement class counsel, and set a fairness hearing for final approval of the settlement. The Court granted preliminary approval to the parties' settlement agreement on May 29, 2013, and a fairness hearing on the proposed settlement was held on September 17, 2013.

The Settlement Agreement provides class members $10.00 vouchers, redeemable for purchases at RadioShack. The vouchers are fully transferable and expire six months after issue. Members of the settlement class include individuals who bought products or services from RadioShack using personal credit or debit cards whose electronically printed receipt contained the expiration date of the credit or debit card used for the purchase. (*See* Mem. in Supp. of Pls.' Mot., Ex. 1 ("Settlement Agreement") § 2.1.) Further terms of the settlement provide that class representatives will receive $5,000 to resolve their individual claims and as incentive awards. (*Id*. § 2.3(C).) The original settlement also provided for a *cy pres* distribution to the Boys and Girls Club in the event that disbursements paid as under the settlement totaled less than $3.25 million. (*Id*. § 2.3(E).) However, class counsel has indicated that the disbursements will exceed $3.25 million, thereby eliminating the need for a *cy pres* distribution. (Mem. in Supp. of Pls.' Mot. at 4.) Class counsel requests $1 million in fees and costs. (Settlement Agreement § 2.3(D).)

## II.     NOTICE PLAN

On May 29, 2013, the Court concluded that the notice plan proposed in the original settlement agreement was the best practicable notice under the circumstances and that it satisfied the requirements of Federal Rule of Civil Procedure ("Rule") 23(c)(2)(B). (*See* Prelim. Approval Order at 2 [Doc. No. 101].) The Court therefore ordered that the notice plan be implemented pursuant to the terms of the original settlement agreement. (*Id*. at 3.) The parties have sufficiently complied with the Court's order approving the class notice plan and directing notice. (*See* Keough Decl. ¶¶ 10-12, 14, 16-17 [Doc. No. 135]; Zimmerman Decl. ¶ 17 [Doc. No. 133].)

"Best practicable" notice requires only the best notice "'under the circumstances, including individual notice to all members who can be identified through reasonable effort.'" *Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672, 677 (7th Cir. 2013) (quoting Fed. R. Civ. P. 23(c)(2)(B)). In this case, the class settlement administrator — Garden City Group — sent written notice of the settlement by direct mail to over 4,000,000 known potential class members and emails to over 550,000 class members for whom Defendant had email addresses. (*See* Keough Decl. ¶¶ 10-11.) Notice was also published in four major news magazines with national circulations and large readerships, providing broader notice to unknown class members. (*Id*. ¶ 14.) Finally, Garden City Group operated a settlement website, *www.shacksettlement.com*, which made class notice and claim forms available to

potential class members and also established a toll-free telephone line that claimants could call to obtain claim forms and make inquiries. (*Id*. ¶¶ 15-18.)

The extensive measures taken by the parties and the class settlement administrator provided adequate notice to class members, including individualized notice to those class members that were identifiable using information available to the parties. Thus, the notice plan and its implementation satisfy due process and Rule 23.

## III.    OBJECTIONS

Three formal objections protesting the settlement have been filed by putative class members represented by counsel. On August 20, 2013, Objectors Vanita Gupta, Gregory Runyard and Charles H. Warner, Jr. filed an amended objection ("Gupta Objection") to the settlement, claiming that the terms of the settlement are unfair, that the requirements for submitting a claim had a chilling effect on potential claimants, and the requested $1 million in attorneys' fees and costs violates the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1712. (*See* Gupta Obj. [Doc. No. 110].) On August 26, 2013, a separate objection was filed by Eduardo Vazquez, who is represented by the same counsel as the Gupta Objectors and presents virtually identical arguments. [Doc No. 112.] Objectors Michael Rosman and Jessica Kasten filed a third objection ("Rosman Objection") to the settlement on August 27, 2013, alleging that the settlement violates CAFA because the proposed attorneys' fees are disproportionately large when compared to the value of the

5

settlement to the class. [Doc. No. 115.] Additionally, the Rosman Objectors argue that class counsel violated Rule 23(h) in three ways: by failing to provide a fee motion prior to the settlement objection deadline; the *cy pres* provision of the settlement is unfair; and the incentive awards for class representatives are excessive.

In addition to the objections supported by formal briefs, eight letters sent by individual class members between June 28 and September 3, 2013, were filed protesting the settlement. Darryl Burton claims that he and military personnel on active duty might be members of the class but were not sufficiently made aware of the class action and that the proposed attorneys' fees are excessive. [Doc. No. 104.] Lawrence Penna poses several questions regarding the nature of the harm to class members and expresses concern about potential harm to RadioShack as a result of the litigation. [Doc. No. 103.] Joseph Bentley objects to the low value of the settlement vouchers and to the fact that the vouchers must be redeemed at RadioShack. [Doc. No. 106.] Neel Freedman objects to the amount of requested attorneys' fees. [Doc. No. 117.] Edward Siegel objects to the value of the settlement vouchers, to the fact that class members are only eligible to receive one voucher, regardless of the number of purchases made at RadioShack, and to the proposed attorneys' fees under the settlement. [Doc. No. 118.] Paul Spencer voices the same objections as Siegel, and also complains that there may be some difficulty identifying class members due to lost receipts, low claim value, and problems with the settlement website. [Doc. No. 118.] Robert Scott lists several objections to the

settlement, including: (1) insufficient notice to the class; (2) the lack of a motion for attorneys' fees; (3) the need to adhere to CAFA; (4) the penalty of perjury requirement to submit a claim; (5) the size of attorneys' fees under the settlement; (6) the need for greater transparency through the settlement website; (7) the *cy pres* component of the settlement; and (8) Scott's belief that the settlement authorizes class counsel to be paid before the settlement is finalized. [Doc. No. 120.]

## DISCUSSION

## I.    LEGAL STANDARD

Pursuant to Rule 23, "the court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class." Fed. R. Civ. P. 23(e)(1)(A). Final approval of a class settlement that is binding on class members requires a district court to determine whether "the settlement is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(3). Factors a court should consider in evaluating the fairness of a class action settlement include "the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length, and expense of the litigation, an evaluation of opposition to the settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006).

"Federal courts naturally favor the settlement of class action litigation." *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996). Evaluations of fairness, reasonableness, and adequacy require that the facts be viewed in a light most favorable to the settlement. *Id.* at 1199. Finally, the reviewing court should not substitute its own judgment as to the best outcomes for litigants and their counsel. *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 315 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir. 1998).

## II.   FAIRNESS, REASONABLENESS, AND ADEQUACY OF THE SETTLEMENT

### A.   Strength of Plaintiffs' Case Against the Value of the Settlement.

"The most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of the plaintiffs' case on the merits balanced against the amount offered in the settlement." *Synfuel*, 463 F.3d at 653 (internal quotes omitted). "Because the essence of settlement is compromise, courts should not reject a settlement solely because it does not provide a complete victory to plaintiffs." *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D. Ill. 2010) (citing *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985); *see Isby*, 75 F.3d at 1200.

FACTA states that "no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or

the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction." 15 U.S.C. § 1681c(g)(1). Under FACTA, if a merchant violates the statute as a result of negligence, a plaintiff may recover only actual damages. See § 1681o(a)(1). "If the violation was willful, however, FACTA allows a plaintiff to elect to recover either actual damages or statutory damages between $100 and $1000. A court may also award punitive damages in cases involving willful violations." *Long v. Tommy Hilfiger U.S.A.*, 671 F.3d 371, 374 (3d Cir. 2012) (citing § 1681n(a)(2)) (internal citation omitted).

Here, there are no actual damages; therefore, the only avenue for monetary relief would be proof that the Defendant acted willfully. For a violation to be "willful," the merchant must knowingly violate the statute or exhibit reckless disregard for its statutory duty. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56-57 (2007). This is a heavy burden to meet, and plaintiffs in previous FACTA class action litigation have struggled to show conclusive evidence of willful violations. *See, e.g., Van Straaten v. Shell Oil Prods. Co. LLC*, 678 F.3d 486, 489, 491 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 983 (2013) (finding no willful violation of FACTA and expressing consternation that a merchant, if ruled "willful", would have to pay "[a]n award of $100 to everyone who has used a Shell Card at a Shell station[, which] would exceed $1 billion, despite the absence of a penny's worth of injury"); *Shurland v. Bacci Café & Pizzeria on Ogden, Inc.*, 259 F.R.D. 151, 156-57 (N.D. Ill. 2009) (concluding that genuine issues of material fact existed as to whether defendant

9

had willfully violated FACTA); *Aliano v. Joe Caputo & Sons-Algonquin, Inc.,* 09 C 910, 2011 WL 1706061, at *4 (N.D. Ill. May 5, 2011) (same); *see also In re Toys R US-Delaware, Inc. – Fair and Accurate Credit Transactions Act (FACTA) Litigation,* — F.R.D. —, 2014 WL 198665, at *8 (C.D. Cal. Jan. 17, 2014) (finding that the plaintiffs' high burden to show willfulness under the statute was a factor in favor of a determination that the settlement was fair).

Plaintiffs have acknowledged the difficulty of proving willful violations of FACTA and have accordingly settled for less than full statutory damages of $100 to $1000 available under the statute. (*See* Pls.' Final Approval Mem. at 14-15.) The time and expense of potentially litigating these issues — especially considering the possibility that Plaintiffs will not be successful in meeting the high "willful" burden — strongly suggest that settlement was a reasoned choice.

Additionally, Plaintiffs point out several indicators of financial instability at RadioShack, such as decreasing stock value and a recently lowered credit rating. These financial difficulties present the risk that Defendant may not be able to satisfy an adverse judgment in the event that the case goes to trial and the Plaintiffs prevail. Such risk necessitates a settlement that guarantees compensation for the class should RadioShack become insolvent. (*See* Markoff Decl. ¶ 30 [Doc. No. 131].) The parties have accomplished this by making the settlement agreement an executory contract through the deadline for class claims, protecting class members in the event that RadioShack files for bankruptcy. (*Id.*) Defendant's

dwindling assets, weighed against the price of continued litigation and alternative settlement structures resulting in class awards that Defendant could not feasibly pay, suggests that the settlement confers a benefit on class members that may not otherwise be available.

In light of the difficult road to winning and securing FACTA damages, the $10 vouchers that are available to class members under the settlement agreement are adequate compensation. *See Murray v. GMAC Mortg. Corp.* 434 F.3d 948, 952 (7th Cir. 2006) ("[R]isk that the class will lose should the suit go to judgment on the merits justifies a compromise that affords a lower award with certainty").

A settlement where class members receive a noncash benefit may nonetheless recover significant value, especially where proceeding with litigation would be tenuous. *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1027 (N.D. Ill. 2000), *aff'd,* 267 F.3d 743 (7th Cir. 2001) (concluding that $6.00 and $4.25 discounts on money transfers "provide significant value to class members because they are freely transferable, immediately available, and good for 35 months in any transaction, including where Defendants are offering other sales or promotions"). The vouchers are transferable and do not require any additional purchase. More importantly, the vouchers provide immediate value to the class members, who are not otherwise guaranteed an award even following lengthy and difficult litigation.

The class will receive a substantial benefit considering the viable defenses that would be available if the case were to proceed to trial, as well as barriers to the

11

satisfaction of a judgment in the event that Plaintiffs were to prevail. All of the

noted attributes of the class award weigh in favor of approval of the settlement

under the first *Synfuel* factor.

## B. <u>Complexity, Length, and Expense of Further Litigation.</u>

If the Court grants final approval to the proposed settlement, class members

will receive an immediate benefit as a result of the class award. Contrary to

assertions made by objectors, resolving factual and legal questions in this case

would not be cut and dried. If the Court were to refuse to grant final approval,

initial indications are that continued discovery and motion practice would be a

difficult, long, and costly process.

The parties would have to grapple with the issues of proof surrounding the

question of willfulness under FACTA. *See* 15 U.S.C. § 1681n(a). The difficulty of

establishing the willfulness component necessary to trigger the penalty would

require significant build-up to summary judgment and probably end in trial. As one

court noted, "no FACTA class action alleging a willful failure to truncate credit card

numbers has been decided in favor of a plaintiff at the summary judgment stage."

*Shurland v. Bacci Café & Pizzeria On Ogden, Inc.*, No. 08 C 2259, 2011 WL

3840339, at *5 (N.D. Ill. Aug. 30, 2011) (discussing history of FACTA class action

litigation and describing cases denying summary judgment to class action

plaintiffs). The time and resources that would likely be spent on extended discovery,

motions for class certification and for summary judgment, and in preparation for trial weigh in favor of approving the proposed settlement.

### C.    Number of Objections to the Settlement.

Of the estimated 16,000,000 potential members of the settlement class, the Court received only fourteen objections. An additional 1,555 class members requested that they be excluded from the settlement. (Keough Decl. ¶ 21.) The fact that the vast majority of class members — over 99.99% — have not objected to the proposed settlement or opted out suggests that the class generally approves of its terms and structure. *See, e.g. In re Mexico Money Transfer Litig.*, 165 F. Supp. 2d. at 1021 ("99.9% of class members have neither opted out nor filed objections to the proposed settlements. This acceptance rate is strong circumstantial evidence in favor of the settlements.") (citations omitted); *see also In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 789 F. Supp. 2d 935, 965 (N.D. Ill. 2011) (same).

As of September 8, 2013, Garden City Group had received and processed 83,332 timely claim forms and was continuing to process late claims. (Keough Decl. ¶ 19.) Even discounting for those who opted out (1,555), there still remains an over 98% acceptance rate from those who responded. The claimants apparently found value in the settlement, to the extent that they were willing to acknowledge the notice and engage in the claim filing process, in spite of what objectors argue to be a nominal recovery under the settlement. This large number of claims filed to this point bolsters a finding of fairness, reasonableness, and adequacy, insofar as class

13

members appear to be satisfied with what they are recouping. *See Schulte v. Fifth Third Bank,* 805 F. Supp. 2d 560, 586 (N.D. Ill. 2001) (finding that a "high participation rate" of over 100,000 claims favored a finding of fairness, reasonableness, and adequacy).

Thus, the relatively large number of claims filed and the low percentage of objections and opt-outs suggests that the class does not oppose the proposed settlement, which favors approval.

### D.    Opinion of Competent Counsel.

Courts are "entitled to give consideration to the opinion of competent counsel that the settlement [is] fair, reasonable and adequate." *Isby,* 75 F.3d at 1200. The lawyers for the parties have described their prior work in class action litigation, including decades of experience in class actions in trial and on appeal. (*See* Zimmerman Decl. ¶¶ 2-7, 14; Markoff Decl. ¶¶ 4-5.) These background qualifications are relevant to their ability to recognize cases appropriate for settlement and to craft a fair and reasonable settlement.

Further, the settlement was the result of arms-length negotiations by experienced counsel. *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1019-20 (placing "significant weight on the unanimously strong endorsement of these settlements" by "well-respected attorneys"); *Alliance to End Repression v. City of Chi.*, 561 F. Supp. 537, 548 (N.D. Ill. 1982) ( "Judges should not substitute their

own judgment as to optimal settlement terms for the judgment of the litigants and their counsel."); *National Rural Telecommunications Cooperative v. DIRECTV, Inc.,* 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair.") (internal citation omitted).

The Court's interactions with the parties through litigation and negotiations leading up to the settlement support the conclusion that class counsel's decision to settle was reasonably based on available information demonstrating likelihood of success at trial, and that a fair settlement was produced . Advocacy by class counsel throughout discovery and settlement negotiations suggests that they have competently represented their clients in reaching the settlement. Given the absence of collusion, as evidenced by time spent in arms-length negotiations under the supervision of this Court, opinion of competent counsel weighs in favor of final approval.

### E. <u>Timing of the Settlement.</u>

The final factor used to determine whether a class action settlement is fair, reasonable, and adequate considers how far a case has progressed prior to the parties' decision to settle. This factor reveals "how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 325 (7th Cir. 1980).

At this stage of the litigation, the parties have exchanged a significant amount of information in formal discovery and through informal proceedings in

15

settlement conferences and other negotiations. (Markoff Decl. ¶ 10.) It is noteworthy that class action settlements have previously been approved in this district without any formal discovery taking place. *See In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d at 966-67 (finding that the stage of the proceedings weighed in favor of final approval absent formal discovery). The information produced by formal discovery and through other exchanges by the parties is sufficient to enable the Court and counsel to assess the strength of Plaintiffs' claims and to create a settlement that addresses those claims, and thus the timing of the settlement weighs in favor of granting final approval. Accordingly, the Court finds that each of the five *Synfuel* factors support the conclusion that the settlement is fair, reasonable, and adequate and therefore warrants final approval.

## II.      OBJECTIONS TO THE SETTLEMENT

### A.      <u>Whether the Proposed Settlement is Fair, Reasonable, and Adequate.</u>

The Court is not persuaded by the Gupta Objectors' position that Plaintiffs would win on the merits**.** To date, there are no definitive examples of FACTA cases in the Seventh Circuit showing that class action plaintiffs are likely to prevail where a defendant has knowledge of the statute's truncation requirement, but nonetheless violates it. The Gupta Objectors rely on *Follman v. Hospitality Plus of Carpentersville, Inc.*, 532 F. Supp. 2d 960 (N.D. Ill. 2007), to show that printing credit card expiration dates on receipts with reasonable warning constitutes

willfulness under FACTA. But *Follman* involved a motion to dismiss, and the court expressly stated that the issue of willfulness "goes beyond the complaint, asking us to consider [the defendant's] interpretation of the statute." *Id.* at 963. On the other hand, plaintiffs have historically struggled to prove willful violations of FACTA as discussed above.

The Gupta Objectors' arguments do not sufficiently present any particular strengths of Plaintiffs' case that would tend to show willfulness. "When the potential liability created by a lawsuit is very great, even though the probability that the plaintiff will succeed in establishing liability is slight, the defendant will be under pressure to settle rather than to bet the company, even if the betting odds are good." *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 678 (7th Cir. 2009). The significant hurdles that Plaintiffs face in the event of continued litigation strongly suggest that settlement is a reasonable and beneficial outcome for both parties.

### B.    Value of the Settlement.

The Gupta Objectors — along with several of the objectors who wrote letters independently — complain that the $10 voucher offered through the settlement is not adequate compensation because FACTA provides for statutory damages between $100 and $1000 in addition to punitive damages for violations. This argument is premised on the supposition that damage awards may only be reduced if the award exceeds constitutional limitations, citing *Murray, v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006). The objectors list selected cases from outside of

the Seventh Circuit to support their argument that FACTA settlements around the country have produced cash settlements. The arguments presented by the Gupta Objectors are not persuasive as to the need for increased recovery among class members under the settlement.

Neither *Murray* nor any other controlling case sets out a minimum amount that must be made available to a class through settlement negotiations. The dicta in *Murray,* relied upon by objectors, concerned a class settlement that left class members with virtually nothing. *See id.* at 952. However, the decision clarified that "[w]e don't mean by this that all class members must receive [the statute's minimum damages of] $100; risk that the class will lose should the suit go to judgment on the merits justifies a compromise that affords a lower award with certainty." *Id.* The settlement before the Court does not raise the same concerns that the Seventh Circuit dealt with in *Murray*. The considerable portion of class members who have filed claims, the vouchers' value and transferability, and Defendant's financial instability all suggest that the settlement provides adequate compensation to the class.

While the $10 value of the voucher is less than the statutory damages Plaintiffs could potentially pursue through individual FACTA claims, the context of the settlement indicates that the vouchers provide adequate compensation to class members. First, the nature of settlement is such that plaintiffs should expect to see some – and occasionally significant – reduction from the amount that they might have recovered following a full trial. "Parties to a settlement benefit by immediately

18

resolving the litigation and receiving some measure of vindication for [their] position[s] while foregoing the opportunity to achieve an unmitigated victory. Thus, the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution *after* trial." *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) (emphasis in original).

Second, class members will receive an immediate benefit under the settlement, rather than potentially waiting years for a larger recovery that may never come. "To most people, a dollar today is worth a great deal more than a dollar ten years from now." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 284 (7th Cir. 2002). The possibility that Plaintiffs could face years of continued litigation in this case, without a clear road to victory, mitigates the larger value of the prescribed statutory penalties under FACTA. Furthermore, possible insolvency facing RadioShack raises the value of the vouchers received immediately through the settlement agreement, where the class may receive nothing following trial. *See* Lisa M. Mizetti & Whitney R. Case, *The Coupon Can Be the Ticket: The Use of "Coupon" and Other Non–Monetary Redress in Class Action Settlements,* 18 GEO. J. LEGAL ETHICS 1431, 1433–34 (2005) ("For defendants that are having financial trouble, payments of redress to class members by coupons and similar methods can prevent bankruptcy. In these cases, the defendants keep their business alive while plaintiffs get valuable goods or services rather than a place in line at bankruptcy court.") (citations omitted).

19

## C.     Whether Coupon Provisions of the Class Action Fairness Act Apply.

The Rosman Objectors insist that many of the elements of the proposed settlement are problematic because they run afoul of CAFA's checks on collusive and unfair settlements in class actions, especially those safeguards concerned with outsized attorneys' fees and nominal awards to class members. The Rosman Objectors specifically argue that CAFA Section 1712(a) dictates that attorneys' fees must be based on the number of vouchers ultimately redeemed by class members. Class counsel respond that this is not a coupon settlement and CAFA therefore does not apply. The Court finds that the vouchers that will be awarded to class members are not "coupons," and that the settlement therefore does not fall under CAFA's guidelines.

Under Section 1712(a) — titled "Coupon settlements" — of CAFA:

If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed.

28 U.S.C. § 1712(a). "The first question is whether the proposed settlement 'provide[s] for a recovery of coupons' within the meaning of CAFA. While CAFA does not expressly define what a coupon is, the legislative history suggests that a coupon is a discount on another product or service offered by the defendant in the lawsuit.'" *In re S.W. Airlines Voucher Litig.*, No. 11 C 8176, 2013 WL 5497275, at *3 (N.D. Ill. Oct. 3, 2013) (quoting *Fleury v. Richemont N. Am., Inc.*, No. C-05-4525, 2008 WL 3287154, at *2 (N.D. Cal. Aug. 6, 2008)). Further, another relevant consideration is

whether the proposed in-kind consideration "force[s] future business with the defendant." *Synfuel,* 463 F.3d at 654.

The Court agrees with the Northern District of California court's interpretation of *Synfuel*, which concluded that "a noncash benefit cannot be a coupon if it allows a consumer to by an *entire* product." *Fleury*, 2008 WL 3287154, at *2 (citing *Synfuel*, 463 F.3d at 654) (emphasis in original). This case presents a noncash benefit that does not force class members to "do business" with Defendant — *i.e.* spend money — in order to take advantage of the in-kind compensation in question. The $10 vouchers that class members will receive will provide enough store credit to purchase over 6,000 individual products before tax. (*See* Markoff Decl. ¶ 25.) Because class members redeeming settlement vouchers will not be required to benefit Defendant by making purchases at RadioShack stores, the Court finds that the settlement is not subject to CAFA's fee guidelines for coupon settlement cases. *See In re Bisphenol-A (BPA) Polycarbonate Plastic Products Liab. Litig.*, MDL 1967, 2011 WL 1790603, at *3 (W.D. Mo. May 10, 2011) ("The term 'coupon' is not statutorily defined, but the Court notes the vouchers provided in this case are unique in that they do not necessarily require the class members expend money of their own in order to realize the benefits of the settlement"); *see also In re Toys R US-Delaware, Inc.,* 2014 WL 198665, at *11 (approving a class action settlement which included vouchers ranging in value from $5 to $30 where the store at issue had approximately 7,000 items available for purchase under $5).

Nevertheless, the Court has the responsibility to protect the class with careful oversight. *See Synfuel,* 463 F.3d at 654 (noting the need for higher judicial scrutiny where class members are rewarded with in-kind payments rather than cash). The Court concludes that the in-kind award at issue is satisfactory compensation for class members, especially considering the lack of demonstrated harm to the class as a result of Defendant's alleged violation of FACTA. *See id.* ("The fairness of the settlement must be evaluated primarily on how it compensates class members for . . . past injuries.").

### D.  Class Counsel's Fee Request.

As discussed above, this Court has concluded that the settlement in question is not a coupon settlement and is therefore not governed by Section 1712(a), and thus the Court is not limited by the statute in awarding fees and costs. "In a certified class action, the court may award reasonable attorney's fees . . . that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Evaluating the reasonableness of proposed attorneys' fees requires courts to "balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund." *Skelton v. Gen. Motors Corp.,* 860 F.2d 250, 258 (7th Cir. 1988). In this case, the approximate fees requested are reasonable when calculated using the lodestar method and further supported by an assessment as a percentage of the settlement's value, suggesting that the fee application should be granted.

22

The settlement agreement stipulates that "Class Counsel shall be paid $1,000,000. . . ." (Settlement Agreement § 2.3(D).) The agreed award to class counsel under the settlement is a lump sum that was negotiated after benefits to the class were established. The award will not reduce recovery by class members, and will be paid apart from relief to the class, meaning that this is not a "common fund" settlement. *See McBean v. City of N.Y.*, 233 F.R.D. 377, 392 (S.D.N.Y. 2006) (describing common funds and distinguishing them class from settlements where payments to class members are separate from attorney compensation). The lodestar approach is the reasonable way to examine the proposed fees because this is not a common fund settlement and therefore does not present a zero-sum structure. *See Yeagley v. Wells Fargo & Co.*, 365 Fed. Appx. 886, 887 (9th Cir. 2010) (unpublished decision) ("Under a fee-shifting statute such as the FCRA . . . the lodestar method is generally the correct method of calculating attorneys' fees.") (citing *Staton v. Boeing Co.*, 327 F.3d 938, 965 (9th Cir. 2003)). Even if this were a settlement that operated subject to the coupon provision of CAFA, the lodestar method would still be appropriate under CAFA Section 1712(b). *See In re S.W. Airlines Voucher Litig.*, 2013 WL 5497275, at *6 ("[28 U.S.C. § 1712(b)] says, in a straightforward way, that if a portion (percentage) of the coupon recovery is not used to determine the attorney's fee, the lodestar method shall be used.") Hence, the fairness of the proposed attorneys' fees will be assessed using the lodestar method.

The lodestar method is calculated by multiplying a reasonable hourly rate for counsel's work by the number of hours spent working on the case. *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010). The Court may adjust the amount awarded based on factors such as the complexity of the legal issues presented by the case, the success achieved by counsel, and whether the case was pursued in the public interest. *Id*. A court "must award a multiplier when attorney's fees are contingent upon the outcome of a case (*i.e.*, there is a possibility that the attorney will not receive any fee)." *Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1988). In deciding on an appropriate multiplier, a court should make a "'a retroactive calculation of the probability of success as measured at the beginning of the litigation." *Id*. The Court may also consider the risk assumed by plaintiff's counsel that they may recover nothing. *See Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975-76 (7th Cir. 1991). Ultimately, "the standard is whether the fees are reasonable in relation to the difficulty, stakes, and outcome of the case." *Id*. The fee petitioner bears the burden of establishing the reasonableness of the award requested. *See Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).

Attorneys from Markoff Leinenberger, LLC request fees and costs amounting to $439,615.00 for 865.6 hours of work. (*See* Markoff Decl. ¶ 38.) Co-counsel Zimmerman Law Offices, P.C. requests an award of $352,618.50, representing 716.5 hours of work. The base amount requested by Class Counsel therefore totals $792,233.50. (*See* Zimmerman Decl., Ex. 4.) Both firms have provided declarations

24

and detailed billing statements reflecting the tasks attorneys were engaged in during billable hours.  Rates requested by participating law firms are as follows:

- Markoff Leinenberger, LLC
  - Paul Markoff: $550 per hour
  - Karl Leinenberger: $500 per hour
  - Non-clerical legal assistance: $100 per hour

- Zimmerman Law Offices, PC
  - Thomas Zimmerman: $550 per hour
  - Adam Tamburelli: $400 per hour
  - Paralegal assistance: $170 per hour

Class Counsel have sufficiently demonstrated that their hourly rates are a reasonable reflection of services by attorneys with similar experience, skill, and reputation nationwide.[1] *See, e.g., Crosby v. Reg' l Transp. Auth.*, 07 C 6235, slip op. at 4 (N.D. Ill. May 24, 2012) (approving $615 hourly rate). Class Counsel further support their request using the Adjusted Laffey Matrix, a table prepared by the U.S. Attorney's Office for the District of Columbia designed to estimate appropriate legal hourly rates based on experience and location. *See Smith v. Dist. of Columbia*, 466 F. Supp. 2d 151, 155-56 (D.D.C. 2006) (describing and approving of the use of the base Laffey Matrix). The Adjusted Laffey Matrix yields a suggested hourly rate of $640 for attorneys with 11 plus years of experience working in Chicago, which is higher that the rate sought by class counsel. (*See* Markoff Decl.¶ 47; Zimmerman Decl. ¶¶ 23-25.)

---

[1] Markoff and Zimmerman both have 17 years of practice experience, including class actions in Illinois. (*See* Markoff Decl. ¶ 2; Zimmerman Decl. ¶ 2.)

In order to approach the agreed upon attorneys' fee amount of $1 million, the base hourly rate suggested by Class Counsel requires a lodestar multiplier of approximately 1.25. Counsel argue that the multiplier is appropriate because there was no certainty of compensation at the outset given the risk that litigation would be unsuccessful. Counsel also assert that their requested multiplier lies at the low end of typical multipliers ranging from one to four. *See Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991) (noting that while multipliers between one to four have been approved, the higher end of the scale "is quite rare").

The Court finds the risk multiplier of 1.25 to be reasonable. The attorneys who took this case did so knowing that they would have to overcome several obstacles in order to achieve success. As discussed above, class counsel faced the task of establishing a "willful" violation of FACTA, as well as greater risk of non-payment due to RadioShack's financial difficulties. Both of those realities, in addition to the inherent risk borne by attorneys pursuing large, time-consuming cases on a contingent basis, suggest that class counsel faced a real risk of walking away with nothing. All told, the risk of defeat and the relative complexity of the case justify a modest multiplier of 1.25, resulting in a fee award of $990,291.88.

The appropriateness of the proposed attorneys' fee is confirmed when cross-checked as a percentage of the settlement's value. In this case, the value of the settlement was estimated to be $4,096,281.74 at the time class counsel submitted the request for final approval. (*See* Keough Decl. ¶¶ 23-24.) By that estimate, the requested attorneys' fees equal approximately 24% of the settlement's value. This

percentage falls below typical percentages in the Seventh Circuit. *See, e.g., Schulte,* 805 F. Supp. 2d at 598 (33.3% of $9.5 million settlement fund); *Taubenfeld v. AON Corp.*, 415 F.3d 597, 598-600 (7th Cir. 2005) (30% of $7.25 million fund). The reasonableness of the requested attorneys' fees as a percentage of the settlement also supports approval.

As a final matter, class counsel requests $88,877.25 in additional attorneys' fees based on the suggestion that 175 extra hours will be necessary to assist in administering benefits to more than 82,000 claimants. Class counsel requests these additional fees "[t]o the extent Class Counsel's lodestar is less than $1,000,000 . . . ." (*See* Br. in Supp. of Request for Att'ys' Fees 13.) The Court has awarded nearly the full requested fee amount, plus costs as laid out below. Because the award approaches the full amount requested by class counsel and because the Court finds the sum of these awards to be fair compensation for time spent on the case, the request for additional compensation for future work is denied.[2]

---

[2]  The Rosman Objectors also request that the Court delay approval of the attorneys' fee award until after the number of settlement vouchers that are redeemed by class members can be established in order to comply with CAFA and to more accurately reflect the value of the settlement. The Court declines to defer the fee award, as CAFA does not govern the settlement, and the objectors fail to offer a compelling reason for delay. *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1034 ("[The court declines to delay the fee award] pending a determination of the number of coupons that are actually redeemed . . . . [T]he court . . . is unwilling to require counsel to become guarantors of circumstances than cannot be dependably predicted by anyone.")

### E.    Class Counsel's Request for Costs.

Federal Rule of Civil Procedure 23(h) gives courts approving class action settlements the discretion to "award reasonable . . . nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Class counsel request an additional $6,789.66 in costs, composed of $700 in filing fees, $84 for service of process, a $5.66 messenger fee, and a $6000 expert witness fee during the course of litigation. The Court finds that the requested costs are reasonable given the scope of the litigation. The Court awards class counsel costs in the amount of $6,789.66.

### F.    Timing of the Fee Award Application.

The objectors challenge the timing of class counsel's fee application, stating that it violates Federal Rule of Civil Procedure 23(h), which requires that "[a] claim for an award must be made by motion . . . at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h)(1). The objectors argue that class members were "impeded from understanding the extent of class counsel's improper fee award" because the fee application — filed September 10, 2013 — was submitted after the August 27, 2013 objection deadline. (Rosman Objection at 8-9.) The Rosman Objectors cite *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 993-94 (9th Cir. 2010), for the proposition that "[t]he plain text of [Rule 23] requires a district court to set the deadline for objections to counsel's fee

request on a date after the motion and documents supporting it have been filed."
(Rosman Objection at 9.)

As the Rosman Objectors acknowledge, the Seventh Circuit has not stated a
requirement that applications for attorneys' fees in class action settlements must
precede the objection deadline. The difficulties highlighted in *In re Mercury* do not
present themselves here. In that case, the Ninth Circuit was markedly concerned
with attorneys' fees being drawn from a common fund, thus compensating the
lawyers at the expense of the class and resulting in an adversarial relationship
between class plaintiffs and their attorneys. *See In re Mercury,* 618 F.3d at 994-95.
This settlement does not involve a common fund, so class members will not benefit
or suffer based on changes to the fee award. District courts in the Ninth Circuit
have declined to follow *In re Mercury* where the benefits of class members are not
directly tied to attorneys' fees awards. *See In re Lifelock, Inc. Mktg. & Sales
Practices Litig.*, No. MDL 08-1977-MHM, 2010 WL 3715138, at *9 (D. Ariz. Aug. 31,
2010) (distinguishing *In re Mercury* as a case that involved a common fund and
therefore required greater oversight); *see also Calloway v. Cash Am. Net of
California LLC*, No. 09-CV-04858, 2011 WL 1467356, at *2 (N.D. Cal. Apr. 12,
2011) ("This lack of a common fund obviates the due process concerns highlighted
by the *Mercury* court.")

Moreover, the Notice of Class Action Settlement in this case gave objectors a
clear understanding of the amount that class counsel would receive under the

settlement terms. Ultimately, several objectors were able to challenge the proposed attorneys' fees because the class notice included the amount of the fee award. (*See*, *e.g.*, Rosman Objection at 4; Vasquez Objection at 14-15; Gupta Objection at 15; Siegel Letter at 2.) The facts that objectors in this case identified and protested the requested fees belies any alleged prejudicial impact as a result of the objection deadline falling before the fee application was received.

The Court finds that class counsel's failure to file an application for attorneys' fees prior to the objection deadline does not warrant rejection of the settlement.

### G.  **Incentive Awards.**

The Rosman Objectors next argue that the $5,000 award to class representatives is too large in light of lesser recovery by non-named class members. (*See* Rosman Objection 12-13.) The Rosman Objectors are primarily concerned with the size of the incentive awards as they compare with the relief offered to individual class members under the settlement, arguing that *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006), dictates that disproportionate awards to class representatives should be rejected.

Incentive awards are valuable insofar as they "induce individuals to become named representatives." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722-723 (7th Cir. 2001). Factors relevant to deciding whether an incentive award is justified

include actions taken by the plaintiff on behalf of the class, the benefits the class reaps from those actions, and the burden class representatives take on in representing the class. *See Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). In this case, the class representatives were unlikely to come forward to act as named representatives in the absence of incentive awards due to the length of the litigation and lack of harm suffered by class members. Furthermore, the class representatives actively participated in the case. Plaintiff Redman offered strategic insights based on his experience as an attorney for venture capitalists and banks. (*See* Markoff Decl. ¶ 30.) The class representatives also acted as a group to monitor the activities of the attorneys by reviewing documents in the case and commenting on the direction of the litigation. (*See id*. ¶¶ 31-33; Zimmerman Decl. ¶ 33.)

Other approved incentive awards in similar class actions suggest that an award of $5000 to each class representative is not unreasonable. *See*, *e.g., In re AT&T Mobility Wireless Data Servs. Sales Litig.,*792 F. Supp. 2d at 1041 ($5000 to named representatives); *In re S.W. Airlines Voucher Litig.*, 2013 WL 4510197, at *11 ($15,000 to named representatives). Because the showing of substantial input by the class representatives in this case comports with the factors laid out in *Cook* and because the award is on par with others from class actions in this district, the Court finds the incentive awards to be justified.

### F.    The Appearance of Collusion.

The Gupta and Vasquez Objectors assert that the settlement was a collusive effort between class counsel, counsel for Defendant, and the class representatives based on three remarks made during a May 8, 2013 hearing before Judge Grady. The Objectors are first concerned by class counsel's statement that RadioShack "got a good deal on the proposed settlement." (Gupta Objection at 9; Vazquez Objection at 3.)  The fact that class counsel stated that the terms of the proposed settlement were favorable to RadioShack does not preclude the possibility that counsel also fought to reach reasonable and fair terms for the class; good settlements should be designed such that the terms are agreeable to both parties.

Similarly, class counsel's statement that the proposed settlement be done with bankruptcy protections does not imply any malfeasance on the part of the attorneys. Instead, it is more likely that counsel was concerned that there would be no possible recovery for any members of the class in the event that RadioShack entered bankruptcy proceedings and was therefore expressing a desire to shield the settlement fund from the company's financial instability.

Finally, the Gupta and Vasquez Objectors express concern because class counsel indicated that a class representative was "tired of waiting." (Gupta Objection at 9; Vazquez Objection at 3.) It is reasonable that a class representative – like any member of the class – would have an interest in being compensated as soon as possible.

Given this Court's first-hand observations of the adversarial nature of the proceedings up to and through protracted settlement negotiations, none of the dialogue presented by the objectors suggests that the settlement was reached in a collusive way.

**G.    The Penalty of Perjury Requirement for Claims.**

The Gupta Objectors state that the number of claims by potential class members have been artificially suppressed by language in the claim forms requiring a certification under penalty of perjury. The Objectors argue that class members were unlikely to submit claim forms given the low value of settlement vouchers when weighed against the perceived seriousness of prosecution for perjury.

The Court finds that this language was a reasonable addition to the claims process as an effort to protect against false claims. Such language is common in claim forms. *See, e.g.*, *Schulte,* 805 F. Supp. 2d at 568 (declaration "under penalty of perjury" for claims by class members). The inclusion of a penalty of perjury requirement as a nominal safeguard against fraudulent claims does not warrant rejection of the settlement.

### H. **Exclusion and Objection Requirements.**

The Rosman Objectors argue that the exclusion and objection requirements of the settlement have further driven down objections and opt-outs by requiring that objectors deliver three copies of their exclusion request or objection to the Court and one, class counsel, and Defendant's counsel. Objectors assert that these requirements are so onerous that they should result in rejection of the settlement. The Court disagrees.

The Objectors cite no compelling authority in support of their argument that mailing three copies of a letter would drive down opposition among class members to the point of delegitimizing the settlement. *See McClintic v. Lithia Motors, Inc.*, No. C11-869RAJ, 2012 WL 112211, at *6 (W.D. Wash. Jan. 12, 2012) (denying preliminary approval to class settlement but stating that "none of the concerns the court has listed, standing alone, is fatal to the settlement"); *see also Galloway v. Kan. City Landsman LLC*, No. 11-1020-CV-W-DGK, 2012 WL 4862833, at *6 (W.D. Mo. Oct. 12, 2012) (court expressed concern with requiring class members to both mail *and* e-mail exclusion forms). Requiring objectors and opt-outs to post multiple letters allows parties to review objections and prepare responses and to assess overall levels participation in the settlement in anticipation of a final fairness hearing. The Court finds this to be a reasonable aspect of the settlement.

## I.      The Settlement Release.

The Gupta Objectors take issue with the release included in the settlement, whereby class members who fail to opt out waive "claims made or that could have been made by Plaintiffs in the Lawsuits or relating in any way to the alleged printing of expiration dates on credit or debit card receipts or relating in any way to FACTA (the 'Released Claims')." (Settlement Agreement § 2.4.)

The settlement's release of future claims is a common mechanism by which a settling defendant can secure peace by providing compensation to a settlement class. The language of the release is sufficiently precise to ensure that class members do not give up legitimate, unrelated claims against Defendant as a result of participating in the settlement. Furthermore, settlement releases are necessary to free defendants from duplicative causes of action. *See, e.g., In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d at 944 (granting final approval to a settlement agreement stipulating that plaintiffs who did not opt out would "release and forever discharge AT & T Mobility from any and all claims . . . causes of action, obligations, . . . and costs . . . relating in any way or arising out of [AT & T's alleged violation fo the Internet Tax Freedom Act]").


## J.      The Settlement's Use of *Cy Pres*.

The Rosman Objectors argue that the use of a *cy pres* fund in the settlement is inappropriate because it diverts funds away from the class members and because

the proposed *cy pres* award recipient, the Boys and Girls Clubs of America, is insufficiently related to the subject matter of the case.

The concerns associated with *cy pres* funds are moot in this case. The settlement agreement stipulates that vouchers would be provided to the *cy pres* recipient only in the event that the total value of vouchers paid to class members, incentive awards, notice and administration costs, and attorneys fees and costs totaled less than $3.25 million. (*See* Settlement Agreement § 2.3(E).) The settlement's value amounting to more than $3.25 million eliminates any potential harm to class members due to the specification of a *cy pres* recipient, because no money will flow from the settlement to the Boys and Girls Club. As a result, it is unnecessary for the Court to analyze the merits of the *cy pres* language in the settlement agreement.

### K.   Objections Raised through Letter.

As a final matter, the Court does not find that objections raised informally in several letters from class members justify rejecting the settlement. First, the letter objections raise issues fully addressed by the Court in this Opinion; these include objections based on attorneys' fees, notice to the class, the value of the vouchers, the penalty of perjury provision in the claim form and the objections to the *cy pres* provision contained in the settlement agreement. Additionally, Objector Scott's argument that Class Counsel will be paid their fees before the settlement is final is inaccurate. Class Counsel's payment depends on final approval of the settlement by

36

this Court and the resolution of any appeals of that approval, should they be filed. (*See* Settlement Agreement § 1.17.)

The Court finds that none of the objections filed in opposition to the settlement warrant rejection of the settlement, and, those objections are overruled.

## CONCLUSION

For the reasons above, the Court concludes that the settlement is fair, reasonable, and adequate. The Court grants the Motion for Final Approval of the Settlement. The Court has considered the objections and overrules them for the reasons presented in this opinion. The Court awards class counsel fees in the amount of $990,291.88 and costs in the amount of $6,789.66. The request for incentive awards in the amount of $5,000 to each class representative is granted.


**SO ORDERED.**                    **ENTERED:**



**DATE: February 7, 2014**         _____
                                   **HON. MARIA VALDEZ**
                                   **United States Magistrate Judge**